UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DAVID SCHNESE,

        Plaintiff,

    v.                                Case No. 19-C-1385

COUNTY OF FOREST and
DARRELL B. WILSON, JR.,

        Defendants.

## DECISION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

Plaintiff David Schnese filed this 42 U.S.C. § 1983 civil rights action against Sergeant Darrell B. Wilson of the Forest County Sheriff's Department for violating his Fourth and Fourteenth Amendment rights when an investigation into a lot line dispute ended in his arrest at his home on October 20, 2017. Schnese alleges that the arrest was without probable cause to believe he committed a crime and that Wilson used excessive force in effectuating it. Schnese also sued Forest County, alleging that the Sheriff's Department's failure to properly train and supervise Wilson caused Schnese's injuries and were the moving force behind the violations of his rights. The case is before the Court on Defendants' motion for summary judgment. For the reasons that follow, that motion will be granted.

## BACKGROUND

On October 9, 2017, Forest County resident Arnold Wolf called the Forest County Sheriff's Department to complain that his neighbor David Schnese had stacked some logs up against a chain link fence located just over the lot line on Wolf's lakefront property that he feared could damage his fence. Defs.' Proposed Findings of Fact (DPFOF) ¶ 3. Deputy Chad Mullis had investigated

the complaint and had been told by Schnese that he had a certified survey showing that the fence in question was actually on his property by one foot. *Id.* ¶ 7. Schnese told Mullis that he would provide him with a copy of the map that weekend. *Id.* ¶ 8. Another officer, Lieutenant Karcz, had unsuccessfully tried to follow up with Schnese about two weeks later on October 20, 2017, but no one was home when Karcz knocked on the door to the residence during the day. Sergeant Wilson was assigned the task of following up on the complaint when he began his shift that day at 6:30 p.m. *Id.* ¶¶ 11–12. Wilson was told by Karcz that Wolf was an elderly man and that Schnese was difficult to deal with. Karcz also told Wilson that there had been a lot line dispute some years earlier between Wolf and Schnese and at some point Schnese had agreed that the fence in question was on Wolf's property. *Id.* ¶ 17. Wilson read Deputy Mullis' report of the complaint and checked the file for the survey map Schnese said he would send. He did not find the map in the file. Wilson then drove out to Wolf's residence.

It was already dark when Wilson arrived at Wolf's residence. Wolf invited Wilson into his house and he and his wife confirmed that Schnese had not removed the logs he placed against their chain link fence. Wolf then told Wilson of a more recent complaint he had with Schnese. Wolf told Wilson that, several hours earlier that day, Schnese had removed a chain Wolf had placed on the lot line between their two properties to serve as a temporary fence. Wolf explained that Schnese had a construction project planned for his property and planned to remove a holding tank. Worried that the contractors Schnese hired to perform the work might enter onto his property, Wolf had attached a chain to several metal posts he had driven into the ground leading from his permanent fence toward the lakefront. Wolf explained to Sergeant Wilson that zoning regulations prohibit placing a fence at that location, but that he had obtained verbal permission from Pam LaBine, the Director of Land and Water Services for the County, to put the chain up as a temporary

measure. Wolf showed Sergeant Wilson a certified survey map of the property and assured Wilson that he was certain his fence and the chain he set up was on his lot, although he conceded that Schnese may not know he had obtained permission from LaBine to put the chain there.

In any event, Wolf told Wilson that, earlier that day, Schnese had removed the chain and tossed it onto Wolf's property. In doing so, Wolf also claimed that Schnese bent a metal post holding the chain. *Id.* ¶¶ 19–26. Schnese claims, however, that he simply unwrapped the chain from one of the posts and placed it on the ground. Schnese denies that he damaged the chain or anything else in the process. Plaintiff's Statement of Additional Facts (PSAF) ¶ 3. In the end, Wolf told Wilson, "There are a lot of things going on here that he needs to get some correction about, and nobody can seem to get him to respond to anything short of maybe getting arrested for something." *Id.* ¶ 5. Wilson told Wolf that he would go "see what [Schnese] has to say for himself, then come talk to you again." *Id.*

Wilson then went to look at the disputed lot line and knocked on the door of Schnese's home to speak with him. Schnese explained that he removed the chain because it was on his property. When asked about the survey map he had agreed to provide, Schnese said he had mailed it to Deputy Mullis the previous Tuesday. Wilson said Schnese's map was not in the file but that he had seen Wolf's map. After a short discussion with Wilson about the location of the lot line and the placement of the chain on a tree that straddled the lot line, Wilson asked Schnese what would be the proper thing to do in such a situation, suggesting that Schnese was in the wrong in removing it without first talking to Wolf. Instead of answering Sergeant Wilson's question, Mr. Schnese insisted that Wolf should have talked to him before he attached his chain to a tree he claimed was on the lot line. Wilson asked Schnese what he should have done several more times and received the same response, with Wilson at one point cutting Schnese off in an effort to redirect

him to his question. Sensing that Wilson had taken Wolf's side in the dispute, the conversation effectively ended with Schnese jabbing his finger in the air and stating in a raised voice, "I'm done fucking around," to which Wilson responded that he should turn around and put his hands behind his back because he was under arrest. Schnese said, "No," and proceeded to pull away from Wilson, who had reached for his arms in order to place him in handcuffs. A struggle ensued. Dkt. No. 26-4.

Because Sergeant Wilson's interactions with the Wolfs and his initial discussion with Mr. Schnese were recorded on his body camera, *id.*, many of the facts leading up to the arrest are undisputed. The video recording was briefly lost when Wilson's body camera fell to the ground as he attempted to place Schnese in custody. Within less than a minute, however, Schnese's daughter began recording the struggle between her father and Sergeant Wilson on her cell phone. Dkt. No. 26-5. As a result, the facts surrounding Mr. Schnese's resistance and Sergeant Wilson's use of force are also largely undisputed, though the video recording is not altogether clear.

As the struggle ensued, Wilson ordered Schnese to get on the ground. When Schnese refused, Wilson threatened him with his taser. Eventually, Schnese was forced to the ground and Wilson tried to get him on his stomach so he could place his hands in handcuffs behind his back. The cell phone video shows Wilson wrestling with Schnese on the ground in the dark and repeatedly ordering him to roll over onto his stomach so that he could be handcuffed. Schnese refused to comply with Wilson's commands, resisted Wilson's efforts to turn him onto his stomach, repeatedly stated "this is a lot line dispute," and accused Wilson of assaulting him. Schnese also directed his daughter to continue recording the incident and stated he would sue Wilson and the County. In the course of the struggle, Schnese alleges that Wilson tackled him, tazed him twice, punched him in the face twice with a closed fist and hit him in the face once with

an open fist, choked him, pepper sprayed him, and pinned him to the ground, including, on several occasions, with a knee on his head. DPFOF ¶ 44. Some, but not all, of this conduct is plainly visible on the video recording. Schnese made no attempt to strike, kick, punch, or batter Wilson or to flee the scene. *Id.* ¶ 45. Eventually, Schnese rolled onto his stomach and allowed Wilson to handcuff him as back-up officers arrived. *Id.* ¶ 43. Schnese states that he sustained three broken vertebrae, as well as other injuries, as a result of Wilson's attempt to arrest him, and has intermittent back pain to this day. *Id.* ¶ 47.

After the incident, Schnese was charged with two counts of disorderly conduct, one count of resisting an officer and a felony count of disarming a police officer. Schnese ultimately entered into an agreement with the prosecutor requiring him to complete twenty hours of community service in exchange for dismissal of the charges. He completed his service, the charges were dismissed, and Schnese thereupon commenced this action. Schnese asserts three causes of action based on violations of his Fourth and Fourteenth Amendment rights: (1) false arrest by Wilson; (2) excessive use of force by Wilson; and (3) deliberate indifference by the County in failing to adequately train and supervise Wilson. Defendants now move for summary judgment.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(e), "when a properly supported motion for summary judgment is made, the adverse party must 'set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986) (citing Fed. R. Civ. P. 56(e)). A plaintiff opposing summary judgment cannot merely rest on his allegations of wrongdoing to get to trial. *Id.* at 249. Instead, he must allege specific facts to establish that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). At the summary judgment stage, the judge does not weigh the evidence to determine

the truth of the matter, but instead determines whether there is "sufficient evidence favoring the nonmoving party" to create a genuine issue for trial. *Anderson*, 477 U.S. at 249. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and summary judgment is appropriate. *Matsushita Elec.*, 475 U.S. at 587.

**ANALYSIS**

Defendants put forth four grounds upon which they assert summary judgment is warranted: (1) Wilson had probable cause to arrest Schnese on the night in question; (2) Wilson's use of force in arresting Schnese was objectively reasonable; (3) Wilson has qualified immunity for his actions; and (4) *Monell* bars Schnese's claims against the County. The Court will begin with the arrest.

**A. Arrest**

**1. Probable Cause**

Defendants first contend that Wilson had probable cause to arrest Schnese for disorderly conduct. They argue that Wilson's knowledge of Schnese's actions prior to, coupled with Schnese's behavior during, their encounter provided probable cause to believe he committed the crime of disorderly conduct in violation of section 947.01 of the Wisconsin Statutes. They argue that Wolf's report that Schnese had removed Wolf's temporary chain fence and tossed it onto Wolf's lot, which Schnese confirmed, gave rise to probable cause that Schnese had committed the crime of disorderly conduct earlier that day. Mr. Schnese's behavior toward Sergeant Wilson, Defendants further argue, gave rise to probable cause that he committed a second crime of disorderly conduct after Sergeant Wilson's arrival.

Schnese counters that Wilson had no reason to believe that Schnese had done anything to justify arrest. Schnese argues that, prior to his being told that he was under arrest, Schnese had

6

been accused of nothing more than unhooking a chain that protruded onto his property and that his use of profanity, by itself, does not amount to disorderly conduct. Under the circumstances, Schnese argues, Wilson had no reasonable belief that he had committed or was about to commit a crime.

"The existence of probable cause to arrest is an absolute defense to any § 1983 claim against a police officer for false arrest or false imprisonment." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013). "Probable cause does not require certainty. It is a 'fluid concept that relies on the common-sense judgment of the officers based on the totality of the circumstances.'" *Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015) (quoting *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006)). "[A]lthough it requires something more than a hunch, probable cause does not require a finding that it was more likely than not that the arrestee was engaged in criminal activity—the officer's belief that the arrestee was committing a crime need only be reasonable." *Abbott*, 705 F.3d at 714. It is an objective inquiry based on "what the officer knew at the time of the arrest" and "'viewed from the standpoint of an objectively reasonable police officer.'" *Id.* (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). The standard also "inherently allows room for reasonable mistakes." *Id.*

Whether Sergeant Wilson had probable cause to arrest Mr. Schnese depends on the elements of the crime of at issue. Although Wilson believed Schnese may have committed the crime of criminal damage to property or disorderly conduct based on what Wolf told him, DPFOF ¶ 31, Defendants have limited their argument to whether probable cause existed only as to the crime of disorderly conduct. Wisconsin's disorderly conduct statute provides in relevant part:

> Whoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance is guilty of a Class B misdemeanor.

7

Wis. Stat. § 947.01(1). There are two elements to a typical disorderly conduct offense in Wisconsin: (1) "that the defendant engaged in violent, abusive, indecent, profane, boisterous, unreasonably loud, or similar disorderly conduct" and (2) "that the defendant's conduct occurred under circumstances where such conduct tends to cause or provoke a disturbance." *State v. Schwebke*, 2002 WI 55, ¶ 24, 253 Wis. 2d 1, 644 N.W.2d 666 (internal quotation marks omitted). The Wisconsin courts have interpreted the phrase "similar disorderly conduct" broadly to mean "conduct of a type not previously enumerated but similar thereto in having a tendency to disrupt good order and to provoke a disturbance." *Id.*

Here, Sergeant Wilson had been informed by Wolf that Mr. Schnese had taken down a chain Wolf installed as a temporary fence to make sure the people Mr. Schnese hired to complete his project did not come on his land. Wolf explained to Sergeant Wilson that zoning regulations prohibit placing a fence in that location, but he had obtained verbal permission from Pam LaBine, the Director of Land and Water Services for the County, to put the chain up as a temporary measure, though he conceded that Schnese may not know he had such permission. Wolf showed Sergeant Wilson a certified survey map of the property and assured Sergeant Wilson that he was certain the chain was on his lot. Wolf had previously complained that Schnese had cut some trees on his lot and stacked the logs on his property against his permanent fence, but his complaint on October 20, 2017, was that Schnese had removed the chain Wolf had set up as a temporary fence and tossed it on the ground several hours earlier.

Detaching a chain from a couple of fence posts under the circumstances of this case would not seem to reasonably fall within the definition of "disorderly conduct" as used in section 947.01. Schnese denies that he damaged the chain or the posts in any way, and there is no suggestion that, when Schnese removed the chain, he did so in a "violent, abusive, indecent, profane, boisterous,

8

unreasonably loud or otherwise disorderly" manner. Nor was it done under circumstances that would seem likely to cause or provoke a disturbance. He simply unwrapped the chain from the post and placed it on the ground. At the time Schnese removed the chain, no one was present. Even if, as Wolf claimed, the chain was on his property, Wolf admitted zoning regulations prohibited putting a fence at that location and that Schnese would not have known that he was given permission to place it there by a County official.

Defendants contend, however, that the Wisconsin Supreme Court has adopted such a broad construction of the State's disorderly conduct statute that Sergeant Wilson's conclusion that he had probable cause to arrest Schnese for his removal of the temporary fence was reasonable. In *State v. Schwebke*, the Court affirmed the conviction of a defendant who had mailed a series of non-threatening anonymous letters with newspaper clippings to a young woman, her former boyfriend, and her sister suggesting that the writer had been watching over the two women as they were going about their daily lives and that the former boyfriend was homosexual. 253 Wis. 2d 1, ¶¶ 5–18. In affirming the defendant's convictions, the Court rejected his argument that the statute required the likelihood of a public disturbance. *Id.* at ¶ 26. "The statute encompasses conduct," the Court held, "that tends to cause a disturbance or disruption that is personal or private in nature, as long as there exists the real possibility that this disturbance or disruption will spill over and disrupt the peace, order or safety of the surrounding community as well." *Id.* at ¶ 30.

Even under the broad holding of *Schwebke*, Schnese's removal of Wolf's chain does not amount to disorderly conduct. Anonymously sending a woman a series of letters suggesting that the sender has been watching over her activities for years is far different than a neighbor removing a chain from a disputed lot line in plain sight. This case arises out of what appears to have been a purely private dispute and the circumstances surrounding it were not such as to "spill over and

9

disrupt the peace, order or safety of the surrounding community." *Id.* In *Schwebke*, the disturbing mailings displayed obsessive behavior from an unknown person that not only frightened the recipients, but caused friends, relatives, and police to become concerned for the safety of the women. *Id.* at ¶ 32. Nothing of a similar nature happened or was likely to happen here. This was a property dispute between neighbors either one of whom was free to commence a civil action in the Circuit Court for Forest County if they were unable to resolve it themselves. Sergeant Wilson had neither the obligation nor the authority to resolve it for them. While Schnese may have been rude or uncivil in removing Wolf's chain without first talking to him, doing so under the circumstances does not amount to probable cause that Schnese committed the crime of disorderly conduct.

The same is true of Mr. Schnese's conduct after Sergeant Wilson arrived at the scene. Frustrated that Sergeant Wilson seemed to be taking Wolf's side in the dispute, Mr. Schnese told him in a raised voice, "I'm done fucking around," and proceeded to turn away. "Profane" is one of the words used to define the conduct that constitutes the crime of disorderly conduct, and Schnese's raising his voice and jabbing gestures could be viewed as "boisterous," another term used to describe the conduct the disorderly conduct statute covers. Wis. Stat. § 947.01. But the described conduct must occur "under circumstances tending to cause or provoke a disturbance." *Id.* As Schnese contends, "the use of profanity alone is not enough to sustain a charge for disorderly conduct." Pl.'s Br. in Opp. at 10 n.7 (citing *State v. Breitzman*, 2017 WI 100, ¶ 57, 378 Wis. 2d 431, 904 N.W.2d 93).

"Wisconsin's disorderly conduct statute proscribes conduct in terms of results which can reasonably be expected therefrom, rather than attempting to enumerate the limitless number of anti-social acts which a person could engage in that would menace, disrupt or destroy public

order." *State v. Zwicker*, 41 Wis. 2d 497, 508, 164 N.W.2d 512 (1969). Not all conduct which tends to annoy another is disorderly conduct. Nor does it apply to conduct that might possibly offend the hyper-sensitive. "Only such conduct as unreasonably offends the sense of decency or propriety of the community is included." *Id.* The design of the disorderly conduct statute is to proscribe substantial intrusions which offend the normal sensibilities of average persons or which constitute significantly abusive or disturbing demeanor in the eyes of reasonable persons.

Under the circumstances of this case, there was no basis to conclude that Schnese's use of profanity had any tendency to cause or provoke a disturbance. For better or worse, we live in a nation where the use of such language has been deemed constitutionally protected. *See Cohen v. California*, 403 U.S. 15, 25 (1971) (reversing disturbing-the-peace conviction for wearing jacket bearing the words "Fuck the Draft" in a county courthouse, stating "one man's vulgarity is another's lyric"). Wilson can be heard using the same word while struggling with Schnese. Mr. Schnese was on his own property, and the only other person present at the time was Sergeant Wilson. Mr. Schnese's statement was no doubt an impolite way of saying that he was through discussing the matter with Sergeant Wilson but being rude or impolite is not a crime. Nothing about his behavior shows that he posed a threat to Sergeant Wilson or was trying to provoke him. This is insufficient to establish probable cause for disorderly conduct.

**2. Qualified Immunity**

Law enforcement officers performing discretionary functions—such as determining whether they have probable cause to arrest—enjoy qualified immunity from suit unless it would have been clear to a reasonable police officer that, given the situation he confronted, his conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Sornberger v. City of Knoxville, Illinois*, 434 F.3d 1006,

1013 (7th Cir. 2006). The test for qualified immunity is also an objective one. *Anderson*, 483 U.S. at 641. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (*per curiam*) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (*per curiam*)). The threshold question in a qualified immunity defense is whether, given the facts taken in the light most favorable to the plaintiff, there is any merit to the underlying constitutional claim. *Saucier*, 533 U.S. at 200; *Norfleet v. Webster*, 439 F.3d 392, 395 (7th Cir. 2006). If so, the court asks whether the right was clearly established at the time of the alleged injury; that is, whether a reasonable officer would have known that his actions were unconstitutional. *Saucier*, 533 U.S. at 202; *Anderson*, 483 U.S. at 640; *Sornberger*, 434 F.3d at 1013.

Here, because Sergeant Wilson did not have probable cause to arrest Mr. Schnese for disorderly conduct, it necessarily follows that there is merit to Mr. Schnese's underlying claim. The question before the Court now is whether a reasonable officer would have known that his actions were unconstitutional. If not, then Sergeant Wilson is immune from liability under § 1983. In other words, Sergeant Wilson is immune from liability under § 1983 for wrongful arrest if "the probable cause determination . . . [is] sufficiently close that an officer reasonably could have believed that probable cause existed, even if that belief ultimately was mistaken." *Wheeler v. Lawson*, 539 F.3d 629, 640 (7th Cir. 2008) (citing *Anderson*, 483 U.S. at 638–39).

Qualified immunity shields law enforcement officers from a suit for damages for illegal arrest if a reasonable officer could have believed the arrest to be lawful, in light of clearly established law and the information the arresting officers possessed. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citing *Anderson*, 483 U.S. at 641). "Often termed 'arguable probable cause,' . . .

12

qualified immunity in this context protects officers who reasonably but mistakenly believe that probable cause exists." *Abbott*, 705 F.3d at 714–15 (citing *Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir. 2012)). The Supreme Court has repeatedly instructed lower courts "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Specificity is critical to making qualified immunity a workable doctrine in the Fourth Amendment context, where it "is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). "If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *accord Sheehan*, 575 U.S. at 613 ("Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures."). "Where the law is open to interpretation, qualified immunity protects police officers who reasonably interpret an unclear statute." *Reher v. Vivo*, 656 F.3d 772, 775 (7th Cir. 2011) (citing *Northen v. City of Chicago*, 126 F.3d 1024, 1027–28 (7th Cir.1997)).

Given the broad scope of conduct that can be prosecuted as disorderly conduct, depending on the surrounding circumstances, it can sometimes be difficult to say whether certain conduct amounts to disorderly conduct. One need only read the decisions of the Wisconsin Supreme Court construing and applying section 947.01 to realize how difficult it can be for a police officer to decide at the scene without the benefit of law briefs whether probable cause for such a crime exists. *See, e.g.*, *Schwebke*, 253 Wis. 2d 1; *State v. Douglas D.*, 2001 WI 47, 243 Wis. 2d 204, 626 N.W.2d 725. In *Schwebke*, for example, as noted above, the Wisconsin Supreme Court held that sending an anonymous letter could constitute disorderly conduct under the circumstances of that case.

13

"The statute encompasses conduct," the Court held, "that tends to cause a disturbance or disruption that is personal or private in nature, as long as there exists the real possibility that this disturbance or disruption will spill over and disrupt the peace, order or safety of the surrounding community as well." 253 Wis. 2d 1, ¶ 30. This interpretation is truly broad. As the then Chief Justice of the Court noted in her dissent, "[v]irtually any antisocial or offensive conduct, including a mailing from one person to another, is now included within the parameters of the criminal disorderly conduct statute." *Id.* at ¶ 52 (Abramson, C.J., dissenting). "Under the majority opinion, the Chief Justice continued, "any disturbing private mailing, even though it is not 'violent, abusive, indecent, profane, boisterous, or unreasonably loud,' can be viewed as spilling over and causing a threat to the surrounding community, because it may be disturbing to those who are told of the private mailing." *Id.*

*Schwebke* is especially significant because the question there was whether the evidence was sufficient to sustain the defendant's conviction; here, the question is whether Sergeant Wilson had probable cause for arrest, a far lower standard. In light of *Schwebke*'s broad reading of Wisconsin's disorderly conduct statute, Sergeant Wilson's conclusion that there was probable cause to arrest Mr. Schnese was not patently unreasonable. Although the Court concluded above that removing a chain set up by one's neighbor as a temporary fence without his permission and tossing it into his yard would not tend to cause or provoke a disturbance, one can conceive of how it could have such an effect. It is true, as Schnese points out, that Wolf does not seem the kind of person who would seek to take matters into his own hands in dealing with someone he appears to have regarded as a bully. But the conclusion that such a possibility may exist, and that, under *Schwebke*, that was enough, was not so obviously unreasonable so as to deprive Sergeant Wilson of good faith immunity. *See Malley*, 475 U.S. at 341 ("As the qualified immunity defense has

14

evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law.").

The same is true of Mr. Schnese's conduct after Sergeant Wilson arrived at the scene. Frustrated that Sergeant Wilson seemed to be taking Wolf's side in the dispute, Mr. Schnese told him in a raised voice, "I'm done fucking around." "Profane" is one of the words used to define the conduct that constitutes the crime of disorderly conduct, and Schnese's raising his voice and jabbing gestures could be viewed as "boisterous," another term used to describe the conduct the statute covers. Wis. Stat. § 947.01. Sergeant Wilson claims that he took Mr. Schnese's tone of voice, words, and gestures as a threat, thereby providing a further basis for his arrest.

Of course, the tests for probable cause and qualified immunity are both objective: would, or could, a reasonable law enforcement officer believe based on the circumstances of the case and the clearly established law that probable cause existed? *Abbott*, 705 F.3d at 714–15. Thus, "the officer's subjective state of mind and beliefs are irrelevant." *Id.* at 714. But there is more here than Sergeant Wilson's subjective state of mind. The fact that Mr. Schnese's language and conduct toward Sergeant Wilson arguably falls within the type of behavior explicitly described in the statute is significant in the assessment of whether probable cause at least arguably existed. *Compare Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 762 (7th Cir. 2006) ("Because, according to Pourghoraishi's version of events, he did not raise his voice, use profanity, make unreasonable noise, or otherwise engage in any behaviors prohibited by the disorderly conduct statute, no reasonable officer could have concluded that he had probable cause to arrest Pourghoraishi."). Here, the video evidence establishes reason to believe that the first element of the crime of disorderly conduct was met. Schnese at least arguably engaged in profane and boisterous conduct.

15

Schnese contends, however, that there was no basis to conclude that he engaged in that conduct under circumstances that tend to cause or provoke a disturbance. The use of profanity alone, he notes, is not enough to sustain a charge for disorderly conduct. Pl.'s Br. in Opp. at 10 n.7 (citing *Breitzman*, 378 Wis. 2d 341, ¶ 57). His statement, he contends, was at worst an impolite way of saying that he was through discussing the matter with Sergeant Wilson. Nothing about his behavior, he claims, suggests that he posed a threat to Sergeant Wilson or was trying to provoke him.

The fact that one of the two elements may have been met goes a long way in assessing whether probable cause arguably existed. *See Sroga v. Weiglen*, 649 F.3d 604, 609–10 (7th Cir. 2011) ("Notice is also an element of the offense, however, and the notice was insufficient. So Sroga could not have been convicted of violating the statute. But the issue is probable cause to arrest rather than proof of guilt. And to form a belief of probable cause, an arresting officer is not required to act as a judge or jury to determine whether a person's conduct satisfies all of the essential elements of a particular statute." (internal quotations omitted)). This is even more true when the remaining element is as nebulous as the second element of Wisconsin's disorderly conduct statute.

Mr. Schnese suggests, however, that because Sergeant Wilson, a law enforcement officer, was the only one present, Mr. Schnese's conduct could not plausibly have tended to cause or provoke a disturbance since law enforcement officers are "expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to fighting words." Pl.'s Br. in Opp. at 12 (quoting *Lewis v. City of New Orleans*, 415 U.S. 130, 135 (1974) (Powell, J., concurring)). There is no exception for conduct directed at law enforcement officers in the disorderly conduct statute, however. Though trained to deal with difficult people, law enforcement

16

officers are also human beings and, as such, can be provoked by unruly people who shout profanities at them.

Schnese also argues that probable cause cannot be shown because his conduct is constitutionally protected. He notes that the Wisconsin Supreme Court has made clear that the disorderly conduct statute only "proscribes speech that is not constitutionally protected." *Id.* at 11 (quoting *State v. A. S.*, 2001 WI 48, ¶ 16, 243 Wis. 2d 173, 626 N.W.2d 712). But Defendants do not claim that Sergeant Wilson could arrest Mr. Schnese because of the words he chose. They argue that there was probable cause to believe that the manner and tone of his voice, in addition to the words he chose, the gestures he made, and the circumstances then existing, tended to cause or provoke a disturbance. Whereas Mr. Schnese may have meant to say only that he was done talking to Sergeant Wilson, Sergeant Wilson perceived him saying he was done trying to resolve it through talk: "Based on the facts and circumstances known to me, including my interpretation of Mr. Schnese's actions, words, and demeanor as being loud, boisterous, and threatening, I believed that there existed a substantial chance that Mr. Schnese's words and actions were threatening and would tend to provoke a disturbance in a public or private place." Decl. of Darrell B. Wilson, ¶ 20. Because Sergeant Wilson's conclusion that probable cause existed is at least arguable, qualified immunity applies. Mr. Schnese's claim against Sergeant Wilson for unlawful arrest in violation of the Fourth and Fourteenth Amendments will therefore be dismissed, and the Court turns to the claim of excessive force.

## B. Excessive Force

### 1. Reasonableness of Force

Wilson also seeks summary judgment on Schnese's claim that he violated his Fourth Amendment rights by using excessive force in his arrest. He contends that his use of force in

arresting Schnese was objectively reasonable because Schnese began resisting him immediately upon being informed that he was under arrest, and that he only used such force as was necessary to place Schnese in handcuffs. Schnese counters that, because Wilson lacked probable cause, the arrest was illegal and no use of force was justified. He argues "Wilson's use of force was excessive *ab initio* because Schnese was privileged to resist." Pl.'s Br. in Opp. at 16. Schnese further argues that, even if he was not privileged to resist, Wilson's use of force was clearly excessive considering the totality of circumstances surrounding the event. *Id.* at 18–25.

Regardless of whether Sergeant Wilson had probable cause to arrest Mr. Schnese for disorderly conduct or any other crime, Mr. Schnese had no right to forcibly resist arrest. While such a right existed at common law, the Wisconsin Supreme Court abrogated the right to resist an unlawful arrest in *State v. Hobson*, 218 Wis. 2d 350, 577 N.W.2d 825 (1998). The problem with the common law rule, the court stated, is that "[w]hen persons resist arrest, they endanger themselves, the arresting officers, and bystanders." *Id.* at 379. The rule allowing physical resistance of an unlawful arrest made sense at a time when resistance did not involve use of firearms and pretrial detention without bail in jails that were breeding grounds for disease was common. Since then, the manner in which law enforcement officers are armed has made self-help far more dangerous and modern reforms in the availability of bail and improvements in the conditions of jails significantly reduced the dangers associated with arrest. *Id.* at 375–76. This is not to say that law enforcement officers always act in good faith and do not make mistakes. But neither public safety nor individual liberty, *Hobson* concluded, are better served by resort to self-help:

> [T]he legality of a peaceful arrest should be determined by courts of law and not through a trial by battle in the streets. It is not too much to ask that one believing himself unlawfully arrested should submit to the office and thereafter seek his legal remedies in court. Such a rule helps to relieve the threat of physical harm to officers

18

who in good faith but mistakenly perform an arrest, as well as to minimize harm to
innocent bystanders.

*Id.* at 380.  The *Hobson* court noted that the majority of jurisdictions had already concluded that
"violent self-help is antisocial and unacceptably dangerous."  *Id.* at 379.  For the reasons it set
forth, the Wisconsin Supreme Court joined those jurisdictions and abrogated the common law
privilege to forcibly resist an unlawful arrest.  *Id.* at 380.

Schnese argues, however, that the Wisconsin Supreme Court abrogated the rule against
forcibly resisting an arrest only where the arrest itself is peaceful: "We hold that a private citizen
may not use force to resist peaceful arrest by one he knows or has good reason to believe is an
authorized peace officer performing his duties, regardless of whether the arrest is illegal in the
circumstances of the occasion."  *Id.*  Here, Schnese argues, the arrest was not peaceful.  He
contends that Sergeant Wilson in effect assaulted him before he began resisting: "it is also clear
Wilson began using force against Schnese even before he indicated to Schnese that he was under
arrest."  Pl.'s Br. in Opp. at 17.  Schnese argues that, because the arrest was not peaceful, his
resistance was therefore privileged and any use of force by Wilson is necessarily excessive.  *Id.*

The video of the incident unmistakably shows, however, that Mr. Schnese began resisting
immediately after Sergeant Wilson told him he was under arrest.  He immediately responded "no"
and refused Sergeant Wilson's order that he turn around so that Wilson could place him in
handcuffs.  It was only then that the struggle ensued, and throughout the struggle, Schnese refused
to comply with Wilson's commands.  It thus follows that Schnese had no right to resist arrest even
if the arrest was illegal.  *See Henning v. O'Leary*, 477 F.3d 492, 495 (7th Cir. 2007) ("In fact, we
do not need to consider the stop and search at all, because even in conjunction with the excessive
force claim, if the stop and search were illegal, Henning had no right to resist the officers' attempts
to arrest him." (citing *Hobson*, 218 Wis. 2d at 378–79).

19

The question remains whether the force used by Wilson was excessive. Mr. Schnese argues that, even if he was not justified in resisting Sergeant Wilson's efforts to place him under arrest, the force used by Sergeant Wilson was excessive. A claim of excessive force in the course of making an arrest is analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). The question to be determined is whether the arresting officer's actions were objectively reasonable. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396. The test is "not capable of precise definition or mechanical application," but "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 559 (1979); *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

Upon consideration of these factors here and viewing the evidence in the light most favorable to Mr. Schnese, a reasonable jury could find that Sergeant Wilson's use of force was unreasonable. The severity of the crime was low. Disorderly conduct is a Class B misdemeanor under Wisconsin law punishable by not more than 90 days in jail, a $1,000 fine, or both. Wis. Stat. §§ 947.01, 939.51(3)(b). Schnese may have been upset, but insofar as the record shows, he did not pose a threat to anyone. Nor was there any risk that he would flee. He was on his own property, and his wife and daughter were present as well. Convinced as he was that he had done nothing wrong, Schnese had no reason to flee. Finally, though he did resist Wilson's efforts to place handcuffs on him, his resistance was not aggressive. He did not strike, kick, punch, or batter

20

Wilson. Instead, Wilson forced Schnese to the ground, repeatedly struck him in the face, choked him, kneeled on his head, shocked him with his taser, and sprayed a chemical irritant in his face and eyes. As a result, Schnese suffered significant injuries, including three broken vertebrae.

That a reasonable jury could find the force used by Wilson unreasonable is even more clear when one considers the County's own policy on the use of force and the alternative course of action he could have chosen. Forest County Sheriff Office Policy § 300.3.2 enumerates the "Factors Used to Determine the Reasonableness of Force" by its deputies. Included among the factors listed are:

> • Immediacy and severity of the threat to deputies or others.
> • Subject's mental state or capacity.
> • Proximity of weapons or dangerous improvised devices.
> • Seriousness of the suspected offense or reason for contact with the individual.
> • The risk and reasonably foreseeable consequences of escape.
> • The effects of drugs or alcohol.
> • Deputy/subject factors (including, inter alia, age, size, relative strength, and skill level, and the number of deputies available vs. subjects).
> • The apparent need for immediate control of the subject or a prompt resolution of the situation.
> • Prior contacts with the subject or awareness of any propensity for violence.

PSAF ¶ 64.

None of these factors support Defendants' contention that the use of force in this case was reasonable. Schnese posed no danger to Wilson, who at six feet and 250 pounds at the time of the incident appears significantly larger than Schnese. Though he became animated in his response to Wilson's suggestion that he had done something wrong in removing Wolf's chain, there was no reason to doubt Schnese's sanity, sobriety, or mental capacity. There were no dangerous weapons nearby and nothing about the circumstances suggested that Schnese was likely to obtain or use one. Defendants do not claim officers of the Forest County Sheriff's Department had prior contacts with Schnese that suggested he had a propensity for violence. The video recording depicts a

21

middle-aged man at his home with his wife and daughter, not a person engaged in serious or violent criminal conduct that poses a danger to the public. And because there was no reason to believe Schnese would flee the jurisdiction, there was no apparent need for immediate control of him or resolution of the situation.

Under these circumstances, if Wilson truly believed an arrest was justified, he could have calmly explained why he was placing Schnese under arrest and the consequences of his resisting before resorting to physical force. Defendants cite *Devenpeck v. Alford*, 543 U.S. 146, 155 (2004), for the proposition that an arrestee is "not entitled to any explanation as to why he was being placed under arrest." But *Devenpeck* states only that an explanation is not constitutionally required; it did not hold that whether or not an arresting officer provides an explanation is irrelevant to a claim of excessive force. To the contrary, *Devenpeck* explicitly acknowledged that "it is assuredly good police practice to inform a person of the reason for his arrest at the time he is taken into custody." *Id.* Here, Wilson abruptly ended the conversation he was having with Schnese and simply told him he was under arrest without any warning or explanation. When Schnese said no and did not comply with Wilson's directions, Wilson immediately resorted to force. Only after the struggle began and Schnese asked why he was being arrested did Wilson say "disorderly conduct." When Schnese asked what he had done, Wilson stated he had put his hand in his face and argued with him. PSAF ¶ 26.

Convinced that he had done nothing wrong, Schnese resisted Wilson's efforts to place handcuffs on him. At that point, rather than resort to force, assuming he thought arrest was necessary, Wilson could have waited for his back-up to arrive and assist him in taking control of Schnese without the need for violence. Alternatively, he could have simply issued a citation to Schnese, informing him of the charge and providing a date for him to appear in court. Wis. Stat.

§ 968.085. A citation could also have been issued for resisting arrest in violation of section 946.41(1) of the Wisconsin Statutes.

Given these alternatives and considering the relevant factors, Defendants are not entitled to summary judgment on the ground that the force used by Wilson was not excessive. Notwithstanding the video evidence, the amount of force used by Wilson in his effort to gain Schnese's compliance is in some dispute. A jury could find from the evidence Mr. Schnese offers that the force used by Sergeant Wilson was unreasonable.

## 2. Qualified Immunity

While a reasonable jury could find Sergeant Wilson's use of force under the circumstances of this case unreasonable under *Graham*, this is not enough to overcome Wilson's defense of qualified immunity. As noted above, "[a]n official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014) (internal quotations omitted). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood he was violating it." *Id.* at 778–79. Although the Court does not require a case directly on point to show a right is clearly established, it has held that "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. Especially in "excessive force" cases, the Court has held that "the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (internal quotation marks and citations omitted). And while *Graham* establishes the

23

objective reasonableness test for evaluating cases alleging excessive force, it does not clearly establish that an officer's decision in a particular case is unreasonable. *Plumhoff*, 572 U.S. at 779.

In this case, the video recordings establish that Mr. Schnese actively resisted Sergeant Wilson's effort to place him under arrest. The force used by Sergeant Wilson was intended to overcome Mr. Schnese's resistance, but it was not deadly force. Deadly force means "force that the actor uses with the purpose of causing or that he knows to create a substantial risk of causing death or serious bodily injury." Model Penal Code § 3.11(2); *see also Garner*, 471 U.S. 1. Although Schnese characterizes his resistance as passive, it is clear from the video recordings that he was actively resisting Wilson's efforts to place handcuffs on him, instead instructing his daughter to make sure she video recorded the entire incident. Schnese disregarded numerous verbal commands, refused to place his hands behind his back, and when taken to the ground refused to lie on his stomach so that Wilson could apply the handcuffs. In an effort to get him to comply, Wilson applied various forms of non-lethal force. Schnese claims he sustained three fractured vertebrae, but there is no evidence that Wilson continued to apply force after Schnese stopped resisting and was placed in handcuffs.

"Although the privilege of qualified immunity is a defense, the plaintiff carries the burden of defeating it." *Mannoia v. Farrow*, 476 F.3d 453, 457 (7th Cir. 2007). "Under the Fourth Amendment, a police officer's use of force in arresting a suspect violates the Constitution if, judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Lester v. City of Chicago*, 830 F.2d 706, 713 (7th Cir. 1987). None of the cases cited by Schnese establish "beyond debate" that the force used by Wilson to effectuate Schnese's arrest was greater than necessary to overcome his resistance. *al-Kidd*, 563 U.S. at 741. The fact is Schnese continued to resist despite the force used by Wilson.

24

Schnese cites *Graham*, *Garner*, *Hobson*, *Rooni v. Biser*, 742 F.3d 737 (7th Cir. 2014), and *Green v. Butler*, 420 F.3d 689 (7th Cir. 2005), in support of his argument that qualified immunity does not apply to the facts of this case.  Pl.'s Br. in Opp. at 25.  The Supreme Court has held, however, that *Graham* and *Garner* "are cast at a high level of generality."  *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004); *Plumhoff*, 572 U.S. at 779.  As a result, those cases seldom provide the clarity needed to overcome an officer's qualified immunity.  *Garner* involved the constitutionality of a statute authorizing the use of deadly force to stop an unarmed fleeing suspect.  471 U.S. at 4–5.  And in *Graham*, the Court established the general rule that the use of force violates the Fourth Amendment if it is excessive under the objective standards of reasonableness and overturned the lower court's application of the wrong standard.  490 U.S. at 394–95.  Neither case addressed the use of non-lethal force to overcome a suspect's physical resistance to arrest.

The same is true of the other cases Schnese cites.  *Rooni* primarily involved a claim for unlawful arrest.  The excessive force claim concerned an allegation that the defendant violated the plaintiff's Fourth Amendment rights by excessively tightening his handcuffs after his arrest, and the court affirmed the district court's dismissal of the plaintiff's claim based on qualified immunity.  742 F.3d at 742–43.  *Hamilton* involved a claim of illegal entry of a parolee's home by parole agents in violation of the rule of announcement.  420 F.3d at 693.  There was no claim of excessive force.  And finally, *Hobson* involved the Wisconsin Supreme Court's abrogation of the common law privilege to use force to resist an illegal arrest.  218 Wis. 2d at 379.  Again, there was no claim of excessive use of force by police.

In sum, Schnese has failed to overcome Wilson's defense of qualified immunity.  He has failed to demonstrate that Sergeant Wilson violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.  In no case cited by Schnese has an

25

authoritative court held that law enforcement officers may not use non-lethal force of the kind Sergeant Wilson used in this case to overcome Mr. Schnese's active resistance to arrest. In other words, existing precedent has not placed the statutory or constitutional question confronted by Sergeant Wilson beyond debate. Sergeant Wilson is therefore immune from liability, and Mr. Schnese's claim against him for excessive force must therefore be dismissed.

## C. Liability of Forest County

Lastly, Mr. Schnese claims that Forest County is liable for Sergeant Wilson's violations of his constitutional rights under § 1983 because it failed to adequately train and supervise him. A county or municipality may not be held liable under § 1983 based on a theory of respondeat superior or vicarious liability. *See Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978). A municipality only may be held liable under § 1983 for constitutional violations caused by the municipality itself through its own policy or custom. *Id.* But Schnese does not criticize the County's policies. To the contrary, Schnese argues that Wilson's excessive force against him "was caused by [Wilson's] utter failure to follow FCSO Policies §§ 300.3.2 and 300.4 . . . ." Pl.'s Br. in Opp. at 27. He contends that it was the County's failure to adequately train and supervise Wilson that directly caused the violations of his Fourth Amendment rights.

A municipality or local government may be directly liable for constitutional violations by its officers when the municipality evinces a deliberate indifference to the rights of the plaintiff by failing to train adequately its officers to prevent the violation. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387–88 (1989). Inadequacy of police training, however, may serve as the basis for § 1983 liability only where it amounts to "deliberate indifference to the rights of persons with whom the police come in contact." *Id.* at 388. Only then can a failure to train be thought of as a city policy or custom that is actionable under § 1983. *Id.* at 389. Deliberate indifference means

26

that "the municipality must act intentionally or with criminal recklessness." *Johnson v. City of Milwaukee*, 41 F. Supp. 2d 917, 930 (E.D. Wis. 1999) (citing *Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991). "In a failure to train case the need for enhanced training must be so obvious and the inadequacy of training so likely to result in the violation of constitutional rights, that a jury could reasonably attribute to policymakers a deliberate indifference to the training needs." *Id.* (citing *Erwin v. Cty. of Manitowoc*, 872 F.2d 1292, 1298 (7th Cir. 1989).

In Wisconsin, training of law enforcement officers is governed by state law. The Wisconsin legislature established the Law Enforcement Standards Board to prescribe minimum requirements for police officer training. *See* Wis. Stat. § 165.85(3). The Board has issued regulations governing police officer training standards in such areas as defensive and arrest tactics, effecting an arrest, weapon retention, and accidental shootings. It is undisputed that Sergeant Wilson's training prior to October 20, 2017, included all training required by the Wisconsin Law Enforcement Standards Board to obtain and maintain status as a certified law enforcement officer and general law enforcement instructor. DPFOF ¶ 134. Among other courses, this training included multiple courses each year in advanced specialized emergency response training (SERT), firearms training, defense and arrest tactics training (DAAT), and taser certification. *Id.* ¶ 135. Generally, evidence that a municipality or local government insistence that its law enforcement officers meet minimum standards of training under state law is sufficient to defeat claim of deliberate indifference to training needs. *Tapia v. Greenwood*, 965 F.2d 336, 339 (7th Cir. 1992); *see also Johnson*, 41 F. Supp. 2d at 931 (holding that "under *Tapia*, compliance by a municipality with such standards defeats any possibility that a reasonable jury could uphold a charge of deliberate indifference").

Notwithstanding these facts, Schnese contends that Wilson's unfamiliarity with the County's own policies and the lack of supervision preclude summary judgment on his claim against the County. To establish *Monell* liability for failure to train, however, more must be shown than a single incident. "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Harris*, 489 U.S. at 390–91; *see also Connick v. Thompson*, 563 U.S. 51, 71 (2011) ("To prove deliberate indifference, Thompson needed to show that Connick was on notice that, absent additional specified training, it was 'highly predictable' that the prosecutors in his office would be confounded by those gray areas and make incorrect Brady decisions as a result. In fact, Thompson had to show that it was so predictable that failing to train the prosecutors amounted to conscious disregard for defendants' *Brady* rights."). Schnese has failed to offer any such evidence here. He has not identified any other instances of false arrest or excessive force by Wilson or any other officers of the Forest County Sheriff's Department.

Finally, liability based on failure to supervise requires that the supervisor know of the subordinate's conduct and approve of it. *Lanigan v. Vill. of East Hazel Crest, Illinois*, 110 F.3d 467, 477 (7th Cir. 1999). Schnese offers no evidence that anyone in a supervisory position with respect to Wilson's conduct had any knowledge of it. It thus follows that Schnese's claim against Forest County must be dismissed.

**CONCLUSION**

For the reasons set forth above, the Court concludes that Mr. Schnese has failed to overcome Sergeant Wilson's defense of qualified immunity and that the evidence does not support a *Monell* claim against the County. This is not to say, however, that Sergeant Wilson's conduct on the evening of October 20, 2017, is to be commended. The Court has also concluded that his

28

arrest of Mr. Schnese was without probable cause and his effectuation of that arrest raises at least a jury question of whether the force used was excessive. Mr. Schnese's conduct can likewise be criticized. Better communication with his neighbor and a calm and more respectful response to Sergeant Wilson's questions would likely have helped avoid the problem entirely. And Mr. Schnese's resistance to Sergeant Wilson's attempt to place him under arrest resulted in the very danger that the Wisconsin Supreme Court's holding in *Hobson* was intended to prevent. One can only hope that both parties will learn from the experience. In any event, for the reasons set forth, Defendants' motion for summary judgment (Dkt. No. 22) is hereby **GRANTED**. This case is dismissed. The Clerk is directed to enter judgment accordingly.

      **SO ORDERED** at Green Bay, Wisconsin this 20th day of August, 2021.

s/ William C. Griesbach
William C. Griesbach
United States District Judge